Angela GERARDI, Plaintiff,

v.

**HUNTINGTON UNION FREE
SCHOOL DISTRICT,**
Defendant.

No. 13–CV–4377 (ADS)(AKT).

United States District Court,
E.D. New York.

Signed Aug. 25, 2015.

Law Office of Steven A. Morelli by Steven A. Morelli, Esq., Russell J. Platzek, Esq., Anabia Hasan, Esq., of Counsel, Garden City, NY, for Plaintiff.

Sokoloff Stern LLP, By: Anthony F. Cardoso, Esq., Garry T. Stevens, Jr., Esq., Steven C. Stern, Esq., of Counsel, Carle Place, NY, for Defendant.

### ORDER

SPATT, District Judge.

This case arises from a dispute about whether the Defendant Huntington Union Free School District (the "District") violated the rights of the Plaintiff Angela Girardi (the "Plaintiff") by allegedly discriminating against her because of her gender when it failed to hire her for a custodial position, and then allegedly retaliated against her after she brought the alleged discrimination to the attention of officials from the District.

On March 2, 2012, the Plaintiff served a notice of claim on the Defendant. On August 17, 2012, she filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On August 2, 2013, she commenced this action.

The Plaintiff asserts the following claims against the Defendant: (1) a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), for alleged gender discrimination, retaliation, and creating a hostile work environment; (2) a claim under 42 U.S.C. § 1983 for an alleged violation of the Plaintiff's rights secured under the Equal Protection Clause of the Fourteenth Amendment; (3) a claim under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL") on the same bases as her Title VII claim; and (4) a claim under the Suffolk County Human Rights Law ("SCHRL") on the same bases as her Title VII claim.

Presently before the Court is the Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 56 dismissing the Plaintiff's complaint in its entirety.

For the reasons set forth below, the Court grants the motion by the Defendant.

### I. BACKGROUND

Unless otherwise specified, the following facts are drawn from the parties' Rule 56.1 statements.

### A. The Underlying Facts

#### 1. The Parties

At the time of filing the complaint on August 2, 2013, the Plaintiff was a forty-two year old woman and a resident of Suffolk County. From September 2005 to

December 13, 2011, the Plaintiff was employed by the District as an account clerk.

The Defendant District is a public school district with an office located in Huntington Station, New York.

## 2. The District's Discrimination Policies

On June 11, 2001, the District adopted a written policy that forbid discrimination, including gender discrimination. In addition, the District implemented an internal complaint procedure to investigate complaints by employees regarding discrimination. The District also permitted employees to file grievances with their union regarding discrimination. (Cardoso Decl., Ex. NN.).

## 3. The Plaintiff's Prior Employment History

From 1998 to 2001, the Plaintiff worked at "Henry Shine," a wholesale company which sold medical equipment and pharmaceuticals. (Cardoso Decl., Ex D at Tr. 15:7–12.) She started working in the sales division and moved to the acquisition division where her responsibility was to "take existing inventory" of the goods in the warehouses of other companies that Henry Shine had acquired. (*Id.* at Tr. 15:15–16:9.).

In May 2001, she left Henry Shine to work as an apprentice electrician for the Local 23 Suffolk County division of the International Brotherhood of Electrical workers (the "Union"). As part of that program, she took classes and worked with full-time electricians to learn the trade. During a deposition, she described her work for the Union as follows:

It was my responsibility to keep the shanty clean, to make sure the supplies were organized, and readily available for senior journeymen. . . . I was the gopher

I had to get whatever the journeymen needed.

(*Id.* at 13:21–14:3.)

On October 19, 2001, the Union terminated the Plaintiff for "excessive absences." (Cardoso Decl., Ex. UU.).

After her termination, the Plaintiff moved to Washington, D.C., where she worked as a temporary employee for hospitals and medical foundations as an office assistant. (Cardoso Decl., Ex. D, at Tr. 9:25–10:14.) She was assigned to these jobs by Kelley Services, a temporary staffing agency, and worked there from 2001 to 2005. (*Id.*)

## 4. The Plaintiff's Employment by the District

On September 27, 2005, the Plaintiff was hired by the District as a "ten-month account clerk" at the District's High School. (Cardoso Decl., Ex. X.) Her designation as a "ten month" employee meant that she did not work during the summer months of July and August. (Cardoso Dec., Ex. E, at Tr. 53:2–7.) Her position was a "civil service position," which meant that her appointment was approved by the District's Board of Education. (*See* Cardoso Decl., Ex. D, at Tr. 9:13–16; Ex. X.).

At the time of her hiring, the Plaintiff spent half of her work day in the school's Nutrition office and the other half of her day at the school's Building and Grounds office.

The Plaintiff's duties at the Nutrition Office, included "inputting invoices, inputting the revenue sheets, processing daily bank deposits, typing the menu for the faculty room, processing special function requests, preparing quarterly New York State tax filings, collecting food orders, and answering phones." (Joint 56.1 Statement, Dkt. No. 48, at ¶ 38.) In addition, the Plaintiff would "sometimes assist with

some of the duties of the full-time clerk when that clerk was out, including payroll and processing free and reduced lunch applications." *(Id.* at ¶ 39.).

The parties agree that the Plaintiff's position at the Nutrition Office was "clerical in nature." *(Id.* at ¶ 23.).

However, the parties dispute the nature of the Plaintiff's position at the Building and Grounds office. The Defendant contends that the Plaintiff's position was solely clerical in nature. In that regard, it relies on the testimony of Al White, the Director of Facilities at the District beginning in 2011. He testified that the Plaintiff's responsibilities included "answering the telephone, making purchase requisitions, paying the bills[,] and typing in work order[s]." (Cardoso Decl., Ex. E, at 71:25–72:3.) In addition, in a September 27, 2011 letter to the Plaintiff, David Grackin ("Grackin"), the District's Assistant Superintendent for Finance and Management from 2000 to 2012, wrote that the Plaintiff was responsible for the following functions: (1) "[p]laying bills that are presented to the school district"; (2) "[g]enerating purchase requisitions at the request of both the Director of Facilities and the Operations Supervisory"; (3) "[a]nswering the telephone as needed in the Facilities Office"; and (4) "[e]ntering data into the work order system." (Cardoso Decl., Ex. R.)

On the other hand, relying on her own testimony, the Plaintiff asserts that her responsibilities were "not solely clerical in nature." (Joint 56.1 Statement, Dkt. No. 48, at ¶ 23.1–23.3.) In that regard, she testified that she was responsible for "managing the work order system for repairs districtwide[,] . . . managing the purchase order system which required new vendor creation, vendor information requests, requisition and managing the purchase order process and paying on those

subsequent bills." (Morelli Decl., Ex. B, at 96:15–22.)

### 5. The Plaintiff's Performance

On November 7, 2005, the Plaintiff met with Grackin and Yolanda Haynes, the Plaintiff's direct supervisor. The parties dispute the purpose of this meeting. The Defendant contends that the Plaintiff requested the meeting for the purpose of obtaining a review of her performance. The Defendant further asserts that at the meeting, Haynes reprimanded the Plaintiff for coming to work late. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 46.).

By contrast, the Plaintiff contends that the meeting was a going away party for Leslie Michaud ("Michaud"), who supervised the Plaintiff, and was leaving the District. *(Id.* at ¶ 46.1).

That same day, on November 7, 2005, in an email to Grackin and Michaud, the Plaintiff wrote:

> I wanted to convey a quick note of thanks for my performance review with yourself, Dave, and Yolanda earlier today. I had been curious as to which areas I was doing well in versus where I needed improvement since my start date September 27, 2005. . . . In preparing to expedite my duties most efficiently, I would appreciate a written breakdown of my core duties in the Nutrition Department so that moving forward, I may be better able to organize myself as to which tasks take priority over other tasks[.]

(Cardoso Decl., Ex. DD.)

On January 13, 2006, in response to her request, the Plaintiff met with Haynes to review her job responsibilities. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 49.).

On June 21, 2006, Haynes signed a written evaluation of the Plaintiff's performance for her work from 2005 to 2006. She

rated the Plaintiff as "needs improvement" in four areas: knowledge, quality of work, organization, and attendance. She rated the Plaintiff as "effective" in four areas: "willingness to meet job requirements"; "ability to work well with others"; "handles sensitive matters in [an] appropriate manner"; "follows verbal or written instructions"; and "wears [a] clean uniform." (Cardoso Decl., Ex. M.).

In a written comments section of the evaluation, Haynes wrote:

> Angela has been continually learning by on the job training in that she still has areas of improvement, but I'm confident with continued training, they will improve.... Angela is progressively improving with accuracy and completeness on clerical input and the organization of the catering billing system. She just needs to work on time management for completeness and accuracy of specific tasks. Angela[']s attendance was good, but her latenesses [sic] were too frequent and need improvement for next year.

(*Id.*)

On December 14, 2006, Grackin write a memorandum to the file stating:

> On Thursday December 14, 2006, [the Plaintiff] had to redo the NYS Sales Tax form for the school lunch program 3 times because she made mistakes. These mistakes would have incurred penalties for the school district if I had not checked it and re-checked it.

(Cardoso Decl., Ex. EE.) The Plaintiff claims that she was never informed of this memo. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 58.1.).

On June 28, 2007, the Plaintiff received an evaluation regarding her performance from July 1, 2006 to June 30, 2007. (Cardoso Decl., Ex. N.) She was rated as "requires improvement" in four areas: quality of work; willingness to meet job requirements; follows verbal or written instruction; and pattern of attendance. She was rated as "effective" in five areas: knowledge; organization and time management; ability to work well with others; and handling sensitive matter appropriately.

On November 9, 2009, Grackin met with the Plaintiff and Catherine Moffitt, the Plaintiff's union representative, to reprimand her for abusing her internet privileges and spending too much time looking at non-work websites.

Beginning in 2010, the District reduced the Nutrition Office clerical positions for budgetary reasons. As part of this effort, on June 7, 2010, the District eliminated the Plaintiff's position at the Nutrition Office. It is undisputed that the Plaintiff's position was not eliminated on the basis of gender discrimination. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 98.).

### 6. The Substitute Custodian List and the Hiring Process

The substitute custodian list is a listing of individuals who fill in for full-time custodians when a custodian is absent or on vacation. During the time of the Plaintiff's employment by the District, to be hired as a substitute custodian, an individual had to fill out an application and pass a background check by the Suffolk County Police Department. (Cardoso Decl., Ex. F, at Tr. 22:11–14.).

In addition, the individual was interviewed by the Paul Rispoli, Al White ("White"), and Grackin. Paul Rispoli was the Director of Facilities until August 2011. (*Id.* at Tr. 9:7–8.) White was the Operations Supervisor from 1999 to 2011 and was promoted to replace Paul Rispoli as the Director of Facilities in August 2011. (*Id.* at Tr. 9:3–20.) Grackin was, as noted, the District's Assistant Superinten-

dent for Finance and Management from 2000 to 2012.

Grackin, White, and Paul Rispoli would each vote on a candidate, and if a candidate got a majority of the votes, Grackin would write a letter to the Board of Education and the Superintendent recommending that the individual be hired and placed on a list of substitute custodians. (*Id.* at Tr. 10:22–12:16.) The Superintendent had the authority to reject the recommendation, and if he or she did not, the Board of Education would vote on whether to hire the candidates. (*Id.* at Tr. 17:18–20.).

It is undisputed that since 2004, the District had a policy under which it did not allow employees who were already working for the District under a separate title to be placed on the substitute custodian list. (Joint 56.1 Statement, Dkt. No. 48, at ¶¶ 126–27.) This requirement was put into place following an audit by the Department of Labor ("DOL"), which concluded that the District would have to pay an individual employed by the District in another capacity for their work as a substitute custodian at a weighted overtime rate, which would exceed what they would otherwise earn as a substitute custodian.

In the Summer 2010, the Plaintiff testified that she asked Grackin and Rispoli to be placed on the substitute custodian list as a means of supplementing her income. (Cardoso Decl., Ex. D, at Tr. 92:2–19.) Following her request, Grackin informed her that because of her current employment by the District as an account clerk, she was ineligible for the substitute custodian list. *(Id.)*

### 7. The Full-time Custodial Position

There is a dispute of fact as to whether the District required applicants for full-time custodial positions to have first served as a substitute custodian. The District contends that it had a "long-standing practice" of only hiring full-time custodians who had previously worked on the substitute custodian list. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 116.) In support of this contention, the District relies on the Plaintiff's testimony that she was aware that the District had such a practice. (Cardoso Decl., Ex. D, at Tr. 103:12–13.) In addition, White and Grackin testified that although there was no written policy requiring experience as a substitute custodian, the District preferred that candidates have such experience. (Cardoso Decl., Ex. E at Tr. 13–18; Ex. G, at Tr. 45:25–46:15.).

The Plaintiff acknowledges that the District had a practice of only hiring full-time custodians who had served as substitute custodians but disputes that it was an absolute requirement. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 116.).

Regardless of whether such an express policy existed, it is undisputed that the District has never hired a full-time custodian who did not first serve on the substitute custodian list. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 169.).

It is also undisputed that the process for hiring individuals to full-time custodial positions involved the same steps as hiring substitute custodians: (i) Grackin, White, and Paul Rispoli would conduct interviews and vote on who they would recommend that the District hire; (ii) if a candidate received a majority of the votes, Grackin would write a letter to the Board of Education and the Superintendent recommending that individual be hired; (iii) the Superintendent of the District would have the authority to reject the recommendation prior to the meeting of the Board of Education; and (iv) if the Superintendent approved of the choice, he would submit the candidate's name to the Board of Education for a vote on whether to hire the

individual. (*See* Joint Statement of Facts, Dkt. No. 48, ¶ 145.).

#### 8. The 2011 Full-time Custodial Job Openings

In late Spring 2011, the District advertised four openings for full-time custodial positions. It is undisputed that prior ·to the Spring of 2011, the District had hired at least two women as full-time custodians. At that time, there were forty full-time custodians employed by the District, none of whom were female. (Cardoso Decl., Ex. F, at Tr. 77:7–12.).

The Plaintiff learned of the 2011 openings from Paul Rispoli. He told her that he, Grackin, and White would be conducting interviews and stated, "You know this doesn't happen often, Angela. Maybe you should consider applying." (Cardoso Decl., Ex. D, at Tr. 88:2–12.).

At the beginning of June 2011, the Plaintiff submitted an application to Dr. Joseph Giani, the then-Assistant Superintendent for Human Resources, for the open custodial positions.

The Plaintiff was one of sixteen individuals who were interviewed for the positions. Four of the sixteen individuals selected for an interview were females. (Cardoso Decl., Ex. F, at Tr. 34:7–23.).

On June 28, 2011, Grackin, White, and Paul Rispoli interviewed the Plaintiff. During the interview, Grackin asked the Plaintiff "clarifying questions regarding technical details" of the descriptions of her prior work that she listed on her resume. (Morelli Decl., Ex. B., at Tr. 210:8–16.).

The Plaintiff testified that White "stared" at her throughout the meeting. (*Id.* at Tr. 211:12–19.) She testified that White asked her two questions during the interview: (i) "at the junior high school, you have to use the power lift to replace the lights on the ceilings. Are you not afraid of heights"; and (ii) "[w]on't you miss dressing in the office?". (*Id.* at Tr. 211:16–213:6.).

The Plaintiff responded to White's two questions: (i) "No I won't" have a problem with heights; and (ii) "No I won't have a problem wearing a uniform." (*Id.* at Tr. 212:20; Tr. 213:10–11.).

The parties dispute whether White's questions were gender-based. The Plaintiff notes that she testified at her April 16, 2014 deposition that she heard from "two or three other senior staff that were privy to interview questions, and they said Al [White] always asks the women if they're afraid of heights." (*Id.* at Tr. 215:16–20.) However, the Defendant notes that when asked at her deposition if White also asked the same question to the male candidates, the Plaintiff testified, "I don't know if [White] asked that [question] to men, but in that conversation, they said he always asks the women." (*Id.* at Tr. 215:24–216:4.).

After· the interviews were conducted, White, Paul Rispoli, and Grackin recommended that Thomas Calderaro ("Calderaro"), Oscar Bonilla ("Bonilla"), James Greenberg ("Greenberg"), and Michael Respoli, Paul Respoli's son, be hired for the four open custodial positions. They further recommended that Shameka Hanson ("Hanson"), a female individual, be hired for a part-time custodial position.

They did not recommend that the Plaintiff should be hired for a custodial position. The parties dispute why she was not recommended. The Defendant asserts that the Plaintiff was not hired because she was not a substitute custodian, had no custodial experience, and misrepresented her job description as an Account Clerk on her resume. In that regard, Grackin recalled discussing with White and Paul Rispoli the fact that "there are certain things in the

resume that were inaccurate as related to her employment in Huntington. And they gave me pause to think that other things in [her] resume perhaps were inaccurate as well." (Cardoso Decl., Ex. G, at Tr. 81:21–82:2.) He also testified that based on his experience working with the Plaintiff, he had "concerns about [her] work ethic." (Id. at Tr. 104:25–105:2.) White also testified that he did not think that the Plaintiff was qualified because she lacked relevant custodial experience. (Cardoso Decl., Ex. F, at Tr. 70:19.).

On the other hand, relying primarily on her own testimony, the Plaintiff contends that she did have relevant custodial experience and that the decision by White, Grackin, and Paul Rispoli was based on her gender, and not on her qualifications. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 181.2; Morelli Decl., Ex. B, at 209:18.).

With regard to their qualifications, it is undisputed that the four individuals—Calderaro, Bonilla, Greenberg, and Michael Respoli—recommended by White, Grackin, and Paul Rispoli for the open full-time custodial positions all had served as substitute custodians.

The Plaintiff points out that Greenberg had a disciplinary history: White testified that Greenberg had been counselled by Paul Respoli regarding his "attendance issues" and that White was aware of those issues prior to recommending that he be hired. (Morelli Decl., Ex. F, at Tr. 123:24–124:3.).

However, the Defendant notes that White also testified that the other three individuals recommended—Calderaro, Bonilla, and Michael Respoli—had not been cited for disciplinary reasons as substitute custodians. (Id. at Tr. 124:19–22.) In addition, the Plaintiff testified that Michael Rispoli and Bonilla were "more so qualified than the other choices from me" and that they were "technically" qualified

for the job. (Morelli Decl., Ex. B, at 235:4–14.) However, she did not believe that Calderaro or Greenberg were equally qualified for a full-time custodial position.

Further, the Plaintiff contends that the only reason why White, Grackin, and Paul Respoli recommended that Hanson be hired as a substitute custodian was because she had dated White's son in the Summer 2006. In the regard, when asked if his son's relationship with Hanson "play[ed] any role in your decision to hire her to a part-time position," White responded, "Yes." (Morelli Decl., Ex. F, at Tr. 76:7–11.).

On July 5, 2011, the Board of Education held a meeting during which it approved the hiring of Calderaro, Bonilla, and Greenberg as full-time custodians, and Hanson as a part-time custodian. At that time, there was still technically an open full-time custodial position, as Michael Respoli had not yet been approved by the Board of Education.

During the first week of August 2011, the Plaintiff called Assemblyman James Conte ("Conte") to express her concerns with the District's hiring process and to ask for his assistance in obtaining the remaining open custodial position. Conte was a New York State Assemblyman who was related to the Plaintiff. (Morelli Decl., Ex. C, at Tr. 95:5–9.).

The Plaintiff's testimony regarding her conversation with Conte is somewhat inconsistent. At her August 2, 2012 deposition, she testified that during the conversation, she focused solely on her issues with the District's use of the substitute custodian list as a way of disqualifying candidates for full-time custodial positions:

According to the [D]istrict's past policy, that stint [as a substitute custodian] makes them more eligible and more desirable of a full-time custodian position

versus me that comes with my breath [sic] of experience working in that department in an office support capacity of time . . .—giving [that] no consideration. (Cardoso Decl., Ex. D, at Tr. 109:2–15.) When asked if she brought any other concerns, such as gender discrimination, to Conte's attention during the conversation, the Plaintiff responded, "Not that I could recall at the moment." (*Id.* at Tr. 110:14–15.).

By contrast, at her April 16, 2014 deposition, almost two-years later, the Plaintiff testified that she expressed to Conte her concern with perceived "sexual discrimination" and told Conte that she "felt strongly that the District utilized many in-house loopholes to not hire better qualified candidates such as myself." (Morelli Decl., Ex. B, at Tr. 227:9–18.).

Following his conversation with the Plaintiff, Conte called Grackin who described the conversation as follows:

> Mr. Conte was actually very embarrassed at having to speak with me. We knew each other since he was a New York State Assemblyman who covered the Huntington School District. And he said he is calling me on behalf of a relation of his, second or third cousin. And she was concerned that she wasn't going to get the job.

(Cardoso Decl., Ex. G, at Tr. 81:2–9.).

Grackin acknowledged Conte's concerns but stated, "I don't discuss personnel matters . . . outside the organization, even if he was a New York State Assemblyman." (*Id.* at Tr. 81:16–20.).

Immediately following the conversation, Grackin informed Superintendent James Polansky ("Polansky") that he had spoken with Conte about the Plaintiff. (Cardoso Decl., Ex. G, at Tr. at 95:5–10.) He testified that he told White about the conversation with Conte several months later after all of the open custodial positions had already been filled. (*Id.* at Tr. 104:10–11.) White also testified that he learned of the call made by Conte to Grackin "months after the positions were filled." (Cardoso Decl., Ex. F, at 78:11.).

On September 12, 2011, the Board of Education approved the hiring of Michael Respoli for a full-time custodial position. At that point, all of the open custodial positions had been filled.

### 9. The Alleged Retaliation by the District

On August 1, 2011, White was promoted from Operations Supervisor to Director of Facilities. (Cardoso Decl., Ex. F, at Tr. 9:11.) He replaced Paul Rispoli, who was retiring.

The Plaintiff was not working at the District at that time because as a ten-month employee she did not work in the months of July and August.

When she returned to the office on September 6, 2011, the Plaintiff testified that:

> the information that I needed to do my job effectively were taken from me. . . . That attendance roster, the substitute custodial list, the new vendor list, all the binders that I might utilize or reference had been put away tucked behind Al White's desk, which was Paul's old office. . . . When I came back and I needed to retrieve one or two years past files to pay on bills, the files didn't exists. The boxes were gone.

(Morelli Decl., Ex. B, at Tr. 160:11–161:8.).

The Plaintiff alleges that these changes were implemented by White in retaliation for her August 2011 conversation with Conte in which she suggested that the District's hiring process was not fair. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 217.).

On the other hand, the Defendant asserts that the changes to the location of White's files were not the result of retaliation, but rather White's efforts, as the newly-hired Director of Facilities, to change the "filing and records storage practice, the process for purchase orders, and the work order process." (*Id.* at ¶ 212.).

The Plaintiff also testified that when she came back to work on September 6, 2011, there were "breakfast sandwich wrappers and folders open and things disheveled in my desk." (Cardoso Decl., Ex. D, at Tr. 60:2–9.).

The Plaintiff also stated that White actively encouraged Donna Rogers ("Rogers"), a full-time senior clerk typist in the Building & Grounds department that sat near the Plaintiff's desk, to ignore the Plaintiff when she asked about the new procedures that White had implemented. (Cardoso Decl., Ex. E, at 243:24–244:20–24.).

The Defendant contends that any isolation the Plaintiff experienced from her colleagues was a result of her own actions, not retaliation. In support, it relies on the Plaintiff's own testimony that on September 7, 2011, the day after she returned to her desk, she told Rogers and White that she "did not want to engage in small talk and instead keep any interactions business, with nothing personal." (Joint 56.1 Statement, Dkt. No. 48, at ¶ 222.)

The Plaintiff further testified that Rogers and White would "chronically stare" at her during the day. (Cardoso Decl., Ex. E, at Tr. 187:18–188:12.) She said that White had "done it over the years. He would chronically ogle me and not say anything." *(Id.)* The Plaintiff also stated that after White found out about her divorce, he would make comments to her in front of other staff members, such as, "Who are you going to see dressed like

that? You have a boyfriend we don't know about?" (*Id.* at Tr. 282:19–25.) She also testified that a "handful of times," White pulled up to her house to "make casual conversation and ask questions." (*Id.* at Tr. 284:18–20.) Finally, she testified that White encouraged her to apply for secretary positions throughout the District. (*Id.* at Tr. 285:2–6.)

**10. The September 12, 2011 Meeting**

As noted, on September 12, 2011, the Board of Education met to vote on whether to approve Paul Rispoli for the final open full-time custodial position.

Prior to that meeting, on September 12, 2011, the Plaintiff met with Dr. Giani, the then-Assistant Superintendent for Human Resources.

At the meeting, she gave Dr. Giani a letter, in which she wrote:

> My qualifications exceed any and all candidates that have been hired as a custodian in the last four months.... The disregard of my time, efforts and experience are blatant and disappointing. I have seen no other choice but to interpret this as a personal attack on my pursuit to improve myself as an employee and as an individual.... Since the rejection to hire me in a new department capacity, the return to my desk with the new 'chain of command,' the office climate is extremely unsupportive and warm as ice.

(Cardoso Decl., Ex. S.)

The Plaintiff testified that Dr. Giani said he would bring her issues to the Superintendent but told her:

> In the meantime ... I can't stop anything that is happening at the Board meeting tonight, but you just need play nice at your desk. Keep your mouth shut. I don't care what you do on the computer or on the telephone. Keep

your mouth shut and play nice. Donna [Rogers] will be retiring in a few years, and you will have her job. Don't worry about it.

(Cardoso Decl., Ex. E, at Tr. 235:23–236:7.)

### 11. The September 26, 2011 Meeting

On September 26, 2011, the Plaintiff met with Grackin and White "to clarify the changes in the Building and Grounds office and ... how [her] role had changed." (Cardoso Decl., Ex. E, at Tr. 256:21–257:2.) According to the Plaintiff's testimony, at the meeting, "[Grackin] dismissed my concerns. He was ambiguous about acknowledging change and suggested that any of my concerns—that [White] was in compliance." *(Id.* at Tr. 258:2–5.).

The Plaintiff also suggested to Grackin that the employees in the Building & Grounds Office were committing "financial abuse." *(Id.* at Tr. 261:22–25.) According to the Plaintiff's testimony, Grackin responded by pointing a finger in the Plaintiff's face, yelling, and storming out of the room. *(Id.* at Tr. 262:5–11.) Before leaving the room, the Plaintiff testified that Grackin said to her, "I don't care how you feel. You will never get your full-time job." *(Id.* at 262:20–21.) The Plaintiff left the room crying. *(Id.* at 92:11–12.).

Following the meeting, the Plaintiff went to see Dr. Giani. She testified, "The man [Dr. Giani] handed me tissues and was holding a can as I blew my nose and shared with him how absolutely terrible the meeting was." (Cardoso Decl., Ex. D, at Tr. 128:4–7.) According to the Plaintiff, Dr. Giani said he would see what he could do.

On September 27, 2011, the following day, Grackin wrote a memorandum to the Plaintiff in which he stated:

On Monday, September 26, 2011, a meeting was held at your request with Al White and yourself regarding your duties in the Faculties Office[.] ... During the course of the meeting, you made certain statements regarding potential improprieties and issues in the Facilities Office. You were unable to point specific examples where any fraud or any other illegal acts were occurring. Should you, in the future, become aware of these things, I would ask that you report them to me or the Superintendent of School immediately.

(Cardoso Decl., Ex. R.)

In an October 4, 2011 letter to Grackin, the Plaintiff responded:

My expectation of this meeting was to receive clarification of my duties as the 10 month Account clerk in the B & G Department working under Al White, as Director. Instead, the discussion was derailed when you 'gave me the floor' requesting that I articulate what issues I had. I felt I was being hard pressed and I take offense to your statement that I was alluding to fraud and illegal acts. I appreciate the fact that you will be available to me should the chance arise that I come across this but I need to illiterate my present of the information.... I questioned whether there were new procedures in place in the B & G office due to the change in personnel and office climate.... The hardest part of the discussion related to the lack of communication in the office. The issue of disclosure relating to departmentally shared information was curtly dismissed and absolutely not addressed. It is difficult for me to not get the impression that in being isolated, I am expected to fail.

(Cardoso Decl., Ex. Q.)

### 12. The Plaintiff's Resignation

On November 10, 2011, the Plaintiff applied for a job with the Developmental

Disabilities Institute ("DDI") as a job coach.

On November 14, 2011, White filled out an employment reference form on behalf of the Plaintiff for the DDI position. In it, he rated her employment performance as "good." (Cardoso Decl., Ex. WW.).

Shortly after submitting her reference, the Plaintiff secured the position at DDI. On November 18, 2011, the Plaintiff notified White she was resigning from her employment with the District. (Cardoso Decl., Ex. W.)

On December 13, 2011, the Board of Education accepted the Plaintiff's resignation.

## II. DISCUSSION

### A. Legal Standards

Fed.R.Civ.P. 56(a) provides that a court may grant summary judgment when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."

"Where the moving party demonstrates 'the absence of a genuine issue of material fact,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In that regard, a party "must do more than simply show that there is some metaphysical doubt as to the material facts[.]" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Further, the opposing party " 'may not rely on conclusory allegations or unsubstantiated speculation[.]' " *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998)).

"Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.1994)).

### B. As to the Plaintiff's Title VII Claims

Although it is not entirely clear based on the way the Plaintiff organized her complaint, it appears that she alleges three Title VII claims: (i) a gender discrimination claim based on the District's decision not to hire her for a full time custodial position; (ii) a retaliation claim based on the alleged actions of the Plaintiff's colleagues and supervisors after she disputed the District's decision not to hire her as a custodian; and (iii) the creation of a hostile work environment on the basis of her gender.

The Defendant asserts that the Plaintiff's Title VII claims should be dismissed because (1) they are time-barred; (2) the Plaintiff has failed to sufficiently rebut the legitimate nondiscriminatory reasons offered by the Defendant for not hiring her as a custodian; and (3) the actions alleged by the Plaintiff fall short of what is required to make a *prima facie* case for retaliation or a hostile work environment claim. (The Def.'s Mem. of Law at 1–20.).

The Plaintiff responds that (1) her claims are not time-barred because they fall under the "continuous violation" exception; (2) she has demonstrated an issue of fact as to whether the legitimate reasons offered by the Defendant for not hiring the Plaintiff as a custodian were a pre-text for discrimination; and (3) she has made a

*prima facie* case for retaliation and the creation of a hostile work environment. (The Pl.'s Opp'n Mem. of Law at 2–19.).

The Court will address each of the Plaintiff's Title VII claims, in turn.

### 1. The Failure to Hire Claim

As set forth below, the Court finds the Plaintiff's gender discrimination claim based on the District's decision not to hire her for a full time custodial position is time-barred.

"Title VII requires a claimant to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996); *see also* 42 U.S.C. § 2000e–5(e). "In states such as New York that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the [Equal Employment Opportunity Commission] is 300 days." *Ragone v. Atl. Video at Manhattan Ctr.,* 595 F.3d 115, 126 (2d Cir.2010); *see also Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir.1999) ("Because the existence of its State Division of Human Rights . . . makes New York a so-called deferral state for Title VII (and hence ADA) purposes . . ., the seminal teaching of *Mohasco Corp. v. Silver,* 447 U.S. 807, 816–17, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) calls for application of the 300–day rule[.]").

However, there is an exception to the 300 day limitations period known as the "continuing violation" exception. "Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 135, 155–56 (2d Cir. 2012) (quoting *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *abrogated on other grounds by Kasten v. Saint–Gobain Performance Plastics Corp.,* 563 U.S. 1, 131 S.Ct. 1325, 1329–30, 179 L.Ed.2d 379 (2011)).

In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court limited the scope of the "continuing violation" exception. There, the plaintiff, an African American employee, alleged that during the period he worked for his defendant-employer he was "consistently harassed and disciplined more harshly than other employees on account of his race." *Id.* at 105, 122 S.Ct. 2061. Some of the alleged discriminatory acts occurred within the 300 day period; while other discriminatory acts occurred outside of the 300 day period. *Id.* The district court granted summary judgment as to the plaintiff's claims that were based on the discriminatory acts that fell outside of the 300 day limitations period. *Id.* at 107, 122 S.Ct. 2061. On appeal, the Ninth Circuit held that the continuous violation doctrine permitted the district court to consider acts of discrimination that fell outside the 300 day deadline so long as they were "sufficiently related" to acts of discrimination that fell inside the 300 day period. *Id.*

Applying this standard, the Ninth Circuit found that there was a dispute of fact as to whether the allegations by the plaintiff that fell outside of the 300 day period were related to those allegations that fell inside the period. As such, it found that the district court erred by granting sum-

mary judgment and finding some of the plaintiff's claims were time-barred. *Id.*

In *Morgan*, the Supreme Court unanimously rejected the Ninth Circuit's view. It found that "discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113, 122 S.Ct. 2061. Rather, the Court found that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* These "discrete acts" include acts such as "termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." *Id.* at 114, 122 S.Ct. 2061. Therefore, for these "discrete" acts of discrimination, the continuing violation exception would not be applicable. *See id.*

However, a divided Court in *Morgan* found that the hostile work environment claims are distinct from other discrimination claims based on "discrete acts" in that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117, 122 S.Ct. 2061. Therefore, the *Morgan* Court held that:

> It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.*

Based on this standard, the divided Court in *Morgan* held that it could not say that the acts of harassment that fell outside the 300 day limitations period were "not part of the same actionable hostile environment claim" as those acts of harassment within the 300 day period. *Id.* at 120–21, 122 S.Ct. 2061. Thus, it af-

firmed the holding of the Ninth Circuit that the Plaintiff's hostile work environment was not time-barred, though it rejected the standard applied by the Ninth Circuit in reaching that decision. *See id.*

Here, on August 17, 2012, the Plaintiff filed a charge of discrimination with the EEOC. (Cardoso Decl., Ex. B.) Therefore, to the extent that the Plaintiff's Title VII claims are based on conduct that occurred prior to October 24, 2011, those claims are time-barred unless they fall under the continuing violation exception or there are allegations of waiver, estoppel, and equitable tolling.

The Defendant asserts that the Plaintiff's gender discrimination claim is time-barred because the decision not to hire the Plaintiff occurred in July 2011, several months prior to October 24, 2011, which as noted, is when the 300 day limitations period began to run.

In response, the Plaintiff asserts that although the decision by Grackin, White, and Rispoli not to recommend the Plaintiff for the full-time custodial position occurred outside of the 300 day period, the decision was part of a "continuous practice and policy of discrimination," and therefore falls under the continuing violation exception. The Court disagrees.

The Second Circuit in *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 147 (2d Cir.2012) explicitly rejected the argument advanced by the Plaintiff. In that case, eleven Asian American police officers brought suit against the defendant, the Port Authority, alleging that it had discriminated against Asian Americans in making promotions to Sergeant. *Id.* at 143. A jury awarded seven of the eleven plaintiffs $1.6 million in back pay, as well as equitable relief. *Id.* at 144. Following trial, the defendant filed a motion under Rule 50 and 59 to set aside the

verdict because, among other things, the jury's award of damages for back-pay included time-barred claims. *Id.* at 145. The district denied its motion, finding that although the discriminatory promotional decisions made by the defendant fell outside of limitations period, the claims were premised on an "ongoing discriminatory" policy that continued into the limitations day period, and therefore, fell under the "continuing violation exception." *Id.*

The Second Circuit in *Chin* disagreed and vacated the jury's back-pay award. *Id.* at 156. Relying on the reasoning of *Morgan,* the court found that a failure to promote is a "discrete act" that is separately actionable, which is "unlike the incidents that comprise a hostile work environment claim, which may not be individually actionable." *Id.* Accordingly, the court found that a failure to promote or other "discrete acts," "which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Id.* at 157. Based on this reasoning, the court vacated the damage awards that were based on a failure to promote individuals that occurred outside of the limitations period. *Id.* at 155.

█ Here, the decision Grackin, White, and Rispoli not to recommend the Plaintiff for the open custodial position was a separate and "discrete" act of "discrimination" that is actionable on its own. *See Morgan,* 536 U.S. at 114, 122 S.Ct. at 2073 ("Discrete acts such as termination, failure to promote, denial of transfer, or *refusal to hire* are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'") (emphasis added); *see also Chin,* 685 F.3d 135, 157 (2d Cir.2012) ("*Morgan* established that an employer's failure to promote is by its very nature a discrete act."). Therefore, even assuming it is true, the allegation by the Plaintiff that the District's refusal to hire her for the custodial position was part of an ongoing practice and policy of gender discrimination cannot prolong the 300 day limitation period for that claim, as the Plaintiff appears to contend. *See Chin,* 685 F.3d at 157 ("[A]n allegation of an ongoing discriminatory policy does not extend the statute of limitations where the individual effects of the policy that give rise to the claim are merely discrete acts."). Accordingly, the Court finds that the Plaintiff's Title VII claim of gender discrimination based on the District's failure to hire her as a full-time custodian is time-barred and dismissed.

### 2. The Retaliation and Hostile Work Environment Claims

The Plaintiff also alleges that she was subjected to a hostile work environment on the basis of her gender and retaliated against after she allegedly disputed the decision by the District not to hire her for an open custodial position. (The Pl.'s Opp'n Mem. of Law at 18–19.) Here as well, the Plaintiff points to no evidence that any of the alleged actions which form the basis of her claims occurred prior to October 24, 2011, when as discussed earlier, the 300 day statute of limitations began to run.

Relying on *Morgan,* the Plaintiff contends that "allegations of a hostile work environment claim are subject to the continuing violation doctrine, where a [p]laintiff may challenge conduct that is part of the same discriminatory treatment, even if some instances of discriminatory conduct occurred over 300 days prior to the filing the EEOC." (The Pl.'s Opp'n Mem. of Law at 4.).

■ The Court disagrees with the Plaintiff's broad interpretation of *Morgan*. As noted above, the divided Court in *Morgan* held, *"[p]rovided that an act contributing to the claim occurs within the filing period,* the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." 536 U.S. at 117, 122 S.Ct. 2061 (emphasis added). Thus, merely alleging the creation of a hostile work environment does not make an otherwise untimely discrimination claim timely, as the Plaintiff appears to contend. Rather, the Plaintiff must allege at least one timely discriminatory act that is part of the alleged pattern or practice that forms the basis of her hostile work environment claim in order for that claim to fall under the continuing violation exception to the 300 day rule. *See McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 76 (2d Cir.2010) (noting that when a court is confronted with a hostile work environment claim, "[w]e start by asking whether McGullam alleged any discriminatory act within the limitations period"); *Szuszkiewicz v. JPMorgan Chase Bank,* 12 F.Supp.3d 330, 338 (E.D.N.Y. 2014) ("It is essential that at least one act that is 'part of the same actionable hostile work environment practice ... falls within the statutory time period.'") (quoting *Morgan,* 536 U.S. at 120, 122 S.Ct. 2061).

In her memorandum, the Plaintiff does not point to a single discriminatory act that occurred after October 24, 2011, when the 300 day limitations period began to run, that could form the basis of a hostile work environment claim. The only potentially discriminatory fact that the Court can identify after October 24, 2011 is the Plaintiff's resignation from the District, effective December 13, 2011. In her complaint, the Plaintiff appears to allege that her decision to resign was the result of the hostile work environment and retaliatory actions that she was subjected to.

However, even if her constructive discharge claim were timely, the Court finds that the evidence submitted by the Plaintiff falls well short of what is required to make out a *prima facie* case for such a claim.

■ A claim for constructive discharge "requires the plaintiff to prove that her employer deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Ferraro v. Kellwood Co,* 440 F.3d 96, 100 (2d Cir.2006) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "The inquiry is objective: Did [the] working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. St. Police v. Suders,* 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

The Second Circuit has stated that "the standard is a demanding one, because 'a constructive discharge cannot be proven merely by evidence that an employee ... preferred not to continue working for that employer' or that 'the employee's working conditions were difficult or unpleasant.'" *Miller v. Praxair, Inc.,* 408 Fed.Appx. 408, 410 (2d Cir.2010) (summary order) (quoting *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993)).

■ Indeed, the "standard is higher than the standard for establishing a hostile work environment," which requires a plaintiff to "show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* (quoting *Alfano v. Costello,* 294 F.3d 365, 373–74 (2d Cir.2002)).

For example, in *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996), the Second Circuit denied summary judgment on a constructive discharge claim based on evidence that the Plaintiff was subject to an "onslaught of unfounded criticism coupled with the threat of immediate termination." The court also found evidence in the record of deliberateness on the part of the defendant based on an affidavit of a former employee stating that "creating intolerable conditions to force unwanted employees to quit was a recognized practice of defendant's managers." *Id.* at 90; *see also Bader v. Special Metals Corp.*, 985 F.Supp.2d 291, 310 (N.D.N.Y.2013) (denying summary judgment where "[the] [p]laintiff has offered evidence of her frequent exposure to a variety of misogynist comments, conduct, drawings, and writings. Moreover, she has offered evidence that her supervisors were repeatedly made aware of this conduct, took no remedial action, and even expressed their approval of the conduct"); *Reimer v. Heritage Asset Mgmt.*, No. 97–CV–0565E(SC), 1999 WL 409513, at *8 (W.D.N.Y. June 16, 1999) (denying summary judgment on a constructive discharge claim based on "reports of repeated threats of termination as well as corroboration by fellow employees of the alleged harassment.").

By contrast, "routine disagreements with supervisors or mild criticisms ... are simply insufficient to establish the sort of 'intolerable' working conditions necessary to a constructive discharge claim." *Miller v. Praxair, Inc.*, 408 Fed.Appx. 408, 410 (2d Cir.2010) (summary order); *see also Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 724 (2d Cir.2010) (affirming a grant of summary judgment on hostile work environment and constructive discharge claims because "the evidence that [the plaintiff] presented to the district court was to the effect that on at least one occasion, two of her coworkers were invited, without her, for unspecified training, and that on at least one occasion, one of her co-workers was assigned to work with a supervisor who was better qualified than Fincher's supervisor. We conclude that these sporadic events, none of which was personally abusive, as a matter of law do not amount to a series of abusive and pervasive incidents of discrimination, nor do they include a single extraordinary one.").

■ Here, the evidence submitted by the Plaintiff falls far short of establishing the kind of "abusive and pervasive incidents of discrimination" required to sustain a constructive discharge claim. The conduct that she complains of was not pervasive. The Plaintiff points to no alleged discriminatory acts prior to her interview for the full-custodial position on June 28, 2011.

Further, the acts she alleges occurred during this period are sporadic and appear to be, at best, remotely connected to gender discrimination. According to the Plaintiff, the alleged pattern of gender discrimination began during her June 28, 2011 interview for a full-time custodial position, where White asked her: (i) "at the junior high school, you have to use the power lift to replace the lights on the ceilings. Are you not afraid of heights"; and (ii) "[w]on't you miss dressing in the office?". *(Id.* at Tr. 211:16–213:6.) The Plaintiff took these comments to be motivated by her gender.

The next alleged acts occurred when she returned to her job as an account clerk at the Building and Grounds Office on September 6, 2011, more than two months later. According to her testimony, these acts included: (i) on one occasion, there were "breakfast sandwich wrappers and folders open and things disheveled in my

desk"; (ii) her "attendance roster, the substitute custodial list, the new vendor list, all the binders that I might utilize or reference had been put away"; and (iii) Rogers, her colleague at the Building & Grounds department, and White, her supervisor, ignored and excluded her from meetings. (Cardoso Decl., Ex. D, at Tr. 60:2–9; Ex. E, at Tr. 241:12–243:18; 259:2–3; Morelli Decl., Ex. B, at Tr. 160:11–161:8.).

She also stated that White: (i) "chronically starre[d]" at her; (ii) on at least one occasion, White made a comment in front of other co-workers, "Who are you going to see dressed like that? You have a boyfriend we don't know about?"; and (iii) encouraged her to apply for secretary positions throughout the District, which she took to be discriminatory. (*Id.* at Tr. 282:19–25; 285:2–6.).

She also met with her supervisors twice during this period. In a September 12, 2011 meeting with Dr. Giani, the Plaintiff testified that Giani told her, "Keep your mouth shut and play nice. Donna [Rogers] will be retiring in a few years, and you will have her job. Don't worry about it." (Cardoso Decl., Ex. E, at Tr. 235:23–236:7.) On September 26, 2011, she had a meeting with Grackin and White, during which Grackin became agitated after the Plaintiff suggested that the department was committing financial abuse and yelled at her, "I don't care how you feel. You will never get your full-time job." (*Id.* at 262:20–21.) The Plaintiff does not dispute that she called these meetings solely for the purpose of clarifying her responsibilities and discussing the District's decision not to hire her as a custodian. Nor does she dispute that the comments made by Grackin and Dr. Giani did not relate to her gender. (Joint 56.1 Statement at ¶¶ 267–268; 300.).

Finally, it is undisputed that she had secured a job as a disability coach at DDI prior to providing notice to the District of her resignation on November 18, 2011. Moreover, the resignation letter itself does not refer to her issues with her work conditions, but rather states, "The opportunities presented to me now take me down a different life path." (Cardoso Decl., Ex. W.).

Even assuming, that the seemingly disparate events that the Plaintiff now points to in her memorandum were related to her resignation, they fall far short of what an objectively reasonable person would consider discriminatory or pervasive enough to force her to resign. There is no testimony showing that she was subjected to an "onslaught of unfounded criticism coupled with the threat of immediate termination[,]" *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996); nor that she was subjected to "a variety of misogynist comments, conduct, drawings, and writings," *Bader v. Special Metals Corp.,* 985 F.Supp.2d 291, 310 (N.D.N.Y. 2013).

Rather, the conditions, as alleged—exclusion from meetings, disagreement over work place duties, and squabbles with colleagues—"largely amount to the sort of routine disagreements with supervisors or mild criticisms that are simply insufficient to establish the sort of 'intolerable' working conditions necessary to a constructive discharge claim." (*Miller,* 408 Fed.Appx. at 410). Therefore, the Court finds that the Plaintiff's constructive discharge claim fails as a matter of law. *See Fincher,* 604 F.3d at 724 (affirming grant of summary judgment on hostile work environment and constructive discharge claim because "the Court concludes that these sporadic events, none of which was personally abusive, as a matter of law do not amount to a series of abusive and pervasive incidents of discrimination, nor do they include a single extraordinary one").

In sum, the Court finds that the Plaintiff's constructive discharge claim fails as a matter of law and her remaining gender discrimination, retaliation and hostile work environment claims are time-barred.

Accordingly, all of the Plaintiff's Title VII claims are dismissed. The Court will now turn to the Plaintiff's remaining claims under 42 U.S.C. § 1983 and New York State law.

### C. As to the Plaintiff's § 1983 Claim

As noted, the Plaintiff also asserts a claim under 42 U.S.C. § 1983 against the District, alleging that it violated her rights under the Equal Protection Clause of the Fourteenth Amendment by failing to hire her for a full-time custodial position on the basis of her gender. (The Pl.'s Opp'n Mem. of Law at 2.).

The District contends that the Plaintiff's § 1983 claim should be dismissed because (i) she fails to allege a municipal policy or custom as is required under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and its progeny; and (ii) she fails to make a *prima facie* case of gender discrimination or rebut the evidence presented by the District that its decision not to hire her was based on her lack of qualifications rather than her gender. (The Def.'s Mem. of Law at 3–8.).

The Plaintiff responds that (i) she has established a municipal policy for purposes of *Monell;* and (ii) that she raised a triable issue of fact with regard to whether the District's decision not to hire her was discriminatory.

The Court finds that the Plaintiff has not established a municipal policy or custom under *Monell.* Therefore, it need not reach the parties' other arguments.

42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

■ "In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir.2004). Additionally, " '[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Id.* (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)).

■ However, in *Monell,* the Supreme Court held that a local government may not be held liable under § 1983 for an "injury inflicted solely by its employees or agents." 436 U.S. at 694, 98 S.Ct. 2018. In other words, local government entities "are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson,* 563 U.S. 51, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011). Instead, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018).

■ The Second Circuit has stated that there are three ways to show that a school

226 of 25.

district acted under a municipal policy for purposes of § 1983:

> A school district's liability under *Monell* may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'

*Hurdle v. Bd. of Educ. of City of New York*, 113 Fed.Appx. 423, 424–25 (2d Cir. 2004) (summary order) (quoting *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir.2004)).

It is undisputed that the District's express policies "forbid discrimination, including gender discrimination and sexual harassment, of any kind in hiring." (Joint 56.1 Statement, Dkt. No. 48, at ¶ 4.) Thus, the Plaintiff cannot show a municipal policy under the first theory of municipal liability—an expressly adopted official policy.

 With regard to the second theory of municipal liability—a district employee was acting pursuant to a longstanding practice or custom—a plaintiff must demonstrate that the "discriminatory practice of municipal officials was so 'persistent or widespread' as to constitute 'a custom or usage with the force of law,'... or that a discriminatory practice of subordinate employees was 'so manifest as to imply the constructive acquiescence of senior policymaking officials.'" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Sorlucco v. New York City Police Department*, 971 F.2d 864, 870 (2d Cir.1992)).

 In her memorandum, the Plaintiff asserts that the District condoned a "pattern or practice of discrimination as evidenced by prevalence of gender stereotyping instigated by its decision makers." (The Pl.'s Opp'n Mem. of Law at 8.) The only evidence that the Plaintiff offers in support of this allegation is her contention that the District did not appoint her to an open-custodial position and instead, appointed four male candidates. (*Id.*) Even assuming that District's failure to hire her was discriminatory, that alone is not sufficient to give rise to an inference of a "widespread or persistent" practice of gender discrimination. *See Carter v. Cnty. of Suffolk*, No. 12–CV–1191 (JFB)(ARL), 2013 WL 6224283, at *4 (E.D.N.Y. Dec. 2, 2013) ("'[A] single incident alleged in a complaint, especially if it involved only actors below the policymaking level, does not suffice to show a municipal policy.'") (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991)).

Moreover, the evidence in the record does not support the existence of such a policy. White testified that there were sixteen individuals who applied for the four full-time custodial positions, four of whom were female. (Cardoso Decl., Ex. F, at Tr. 34:7–23.) While no females were hired as full-time custodians, it is undisputed that Shameka Hanson, one of the female applicants, was hired as a part-time custodian. (Joint 56.1 Statement, Dkt. No. 48, at ¶ 171.) It is also undisputed that the District had previously hired Pat Harper Lee, a female individual, as a substitute custodian. (*Id.* at ¶ 146.).

Based on this evidence, the Court finds the Plaintiff's allegation that the District had a "widespread or persistent" policy of gender discrimination in its hiring process to be conclusory and unsupported by the record and, therefore, insufficient to establish *Monell* liability. *See Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993) ("The mere assertion, however, that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference."); *Sheikh v.*

*City of New York, Police Dep't,* No. 03–CV–6326 (NGG), 2008 WL 5146645, at *11 (E.D.N.Y. Dec. 5, 2008) ("Conclusory allegations of municipal liability will not defeat a motion for summary judgment on a *Monell* claim.").

With regard to the last theory of liability—whether a district employee was acting as a "final policymaker"—the Second Circuit has stated in order to show that an official is a "final policymaker," a plaintiff must show either that the individual is (i) " 'responsible under state law for making policy in that area of the [municipality's] business' "; or (ii) has the " 'power to make official policy. . . . on [the] particular issue' involved in the action." *Hurdle v. Bd. of Educ. of City of New York,* 113 Fed.Appx. 423, 425 (2d Cir.2004) (quoting *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000)).

Here, the Plaintiff alleges that after she was interviewed for the open custodial position on June 28, 2011, Grackin, White, and Rispoli violated her Equal Protection rights by refusing to recommend her to the Board of Education for one of the four open full-time custodial positions on the basis of her gender. Of importance, she does not allege any discriminatory intent on the part of the Board of Education, who on July 5, 2011 and September 12, 2011, approved the four male individuals recommended by Grackin, White, and Rispoli. *(See* Joint 56.1 Statement, Dkt. No. 48, at ¶ 181.) Therefore, the question for the Court is whether (i) Grackin, the Superintendent for Finance and Management; (ii) White, the then-Operations Supervisor at the District; and (iii) Rispoli, the then-Director of Facilities, were final policymakers for the purpose of making hiring decisions for open custodial positions.

The "identification of policymaking officials is a question of state law." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480,

106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *see also Dressler v. New York City Dep't of Educ.,* No. 10 CIV. 3769(JPO), 2012 WL 1038600, at *17 (S.D.N.Y. Mar. 29, 2012) (same). The Supreme Court in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) explained that in order to be a policymaker:

Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority. . . . [M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Id.* at 482–83, 106 S.Ct. 1292.

"As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *see also Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000) ("[T]he question of whether a given official is the municipality's final policymaking official in a given area is a matter of law to be decided by the court.") Moreover, it is the plaintiff's burden to establish that an official is a policymaker for purposes of *Monell. Jeffes,* 208 F.3d at 57 ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law.").

Under New York Education Law ("NYEL") § 1709(16), the Board of Edu-

cation has the authority "to contract with and employ such persons as by the provisions of this chapter are qualified teachers, to determine the number of teachers to be employed in the several departments of instruction in said school." N.Y. Educ. Law § 1709 (McKinney). Thus, under the provision of the NYEL, it appears that the Board of Education maintains control over policies regarding the hiring process.

Indeed, the undisputed evidence appears to confirm that the Board of Education maintained control of the hiring process. The Plaintiff does not dispute that the process for hiring individuals to custodial positions involved the following steps: (i) Grackin, White, and Paul Rispoli would conduct interviews and vote on who they would recommend the District hire; (ii) if the candidate received a majority of the votes, Grackin would write a letter to the Board of Education and the Superintendent recommending that individual be hired; (iii) the Superintendent of the District would have the authority to reject the recommendation prior to the meeting of the Board of Education; and (iv) if the Superintendent approved of the choice, he would recommend him or her to the Board of Education, which would then vote on whether to hire the individual. (See Joint Statement of Facts, Dkt. No: 48, ¶ 145.).

Further, it is also undisputed that this process was followed with regard to the four open custodial positions at issue in this case—namely that: (i) Grackin, White, and Rispoli voted on the candidates after interviews were conducted on June 28, 2011; (ii) Grackin recommended the candidates in a letter to the Board of Education and the Superintendent prior to the meetings of the Board on July 5 and September 12, 2011; (iii) the then-Superintendent Polansky did not reject the recommendation; and (iv) Polansky recommended the four candidates to the Board of Education, which voted to approve the candidates at meetings on July 5 and September 12, 2011. (Id. at ¶¶ 172–79.).

Thus, it is clear that under this process, the Board of Education and the Superintendent of the District had the power to overrule the recommendation of White, Grackin, and Rispoli, with regard to hiring custodians. Therefore, both state law and the evidence in the record demonstrate that White, Grackin, and Rispoli were not "final policymakers" with regard to the District's decision not to hire the Plaintiff. See, e.g., Hurdle v. Bd. of Educ. of City of New York, 113 Fed.Appx. 423, 426 (2d Cir.2004) (summary order) ("[T]he superintendent's decisionmaking authority is subservient to the powers of the chancellor in this regard.... Romandetto's transfer decision concerning Hurdle can hardly be viewed as 'final.' "); Fierro v. New York City Dep't of Educ., 994 F.Supp.2d 581, 589 (S.D.N.Y.2014) ("[W]ith respect to termination of teachers' employment, principals do not have final decisional authority; their decisions are subject to appeal to the Chancellor and the [Department of Education].... Thus, Colon is not a municipal policymaker with respect to the conduct challenged in Fierro's only timely claim (constructive discharge)."); McDonald v. Bd. of Educ. of City of New York, No. 01 CIV.1991 (NRB), 2003 WL 21782685, at *4 (S.D.N.Y. July 31, 2003) ("Where, as here, that authority is circumscribed by the Chancellor and the Board's authority to overrule the superintendent, the superintendent cannot be said to be the final policymaker.").

The Plaintiff acknowledges that the Board of Education had formal policymaking authority over hiring decision, but contends that it informally delegated its authority to Grackin, White, and Rispoli. (The Pl.'s Mem. of Law at 8.) In support, she relies on testimony by Grackin that in

his experience, the Board of Education "usually" accepts the hiring recommendation of the Superintendent and that it would not "usually" review the employment applications or credentials of candidates. (Morelli Decl., Ex. C, at Tr. 24:7–21.) Here again, the Court disagrees.

The Plaintiff points to no formal delegation by the Board of Education of its policymaking and oversight authority with respect to the District's hiring policies. Moreover, the fact that the Board of Education "usually" adopted the hiring recommendations of Grackin, White, and Rispoli does not establish that they had policymaking authority over hiring decisions. Indeed, White testified that while the Board of Education "usually" follows hiring recommendations by the Superintendent, "there have been times" when it did review the recommendations made by the Superintendent. (*Id.* at Tr. 25:22.).

Further, as noted above, the Superintendent also had the authority to reject recommendations by Grackin, White, and Rispoli. Thus, even if, as the Plaintiff contends, that the Board of Education "rubber stamped" recommendations by the Superintendent, she points to no evidence in the record suggesting that the Superintendent also "rubber-stamped" the recommendations of Grackin, White, and Rispoli. Therefore, the Court concludes that the Plaintiffs have failed to carry their burden to establish that Grackin, White, and Rispoli, are "final policymakers" as a matter of law. *See Hurdle,* 113 Fed.Appx. at 427 ("Even if Romandetto was the decisionmaker with regard to Hurdle's transfer, that does not establish that she had the authority to set the policy authorizing involuntary employee transfers."); *T.E. v. Pine Bush Cent. Sch. Dist.,* 58 F.Supp.3d 332, 376 (S.D.N.Y.2014) ("[The] [p]laintiffs point to no formal delegation of the Board's policymaking authority to Stein-

berg or the principals, and the record demonstrates that the Board has policy-making and oversight authority with respect to the District's disciplinary policies, the Court concludes that Plaintiffs have failed to carry their burden to establish that Steinberg and the principals are 'final policymakers' as a matter of law.").

In sum, the Court finds that the Plaintiff has failed to establish that Grackin, White, and Rispoli were acting pursuant to "pursuant to official municipal policy" when it decided not to recommend the Plaintiff for a custodial position. Therefore, the Plaintiff's claim pursuant to 42 U.S.C. § 1983 fails as a matter of law and is dismissed.

### D. As to the Plaintiff's State Law Claims

The Plaintiff also asserts two New York State law claims under the NYSHRL and SCHRL for the same conduct that she alleged with respect to her federal claims—namely, gender discrimination, retaliation, and hostile work environment.

The District asserts that the Plaintiff's state law claims should be dismissed because (i) her NYSHRL claim is time-barred; and (ii) SCHRL does not provide for a private cause action.

In response, the Plaintiff disputes that her NYSHRL is time-barred, relying on the continuing violation doctrine. She does not dispute the Defendant's argument with regard to the SCHRL. (The Pl.'s Opp'n Mem. of Law at 6.).

For the reasons set forth below, the Court agrees with the District and finds the Plaintiff's state law claims fail as a matter of law.

▪ With regard to the Plaintiff's NYSHRL claim, in general the "statute of limitations under the NYSHRL and the NYCHRL is three years." *Sotomayor v. City of New York,* 862 F.Supp.2d 226, 248–

49 (E.D.N.Y.2012) aff'd, 713 F.3d 163 (2d Cir.2013) (citing N.Y. C.P.L.R. 214(2); N.Y.C. Admin. Code § 8–502(d)). However, NYEL § 3813 provides for a shorter statute of limitations in actions against schools: "[N]o action or special proceeding shall be commenced against any entity specified in subdivision one of this section more than one year after the cause of action arose." N.Y. Educ. Law § 3813(2–b) (McKinney). In turn, subdivision one of section 3813 lists "school districts," as among the entities that are subject to this shorter limitation period. *Id.*

Here, as noted earlier, the latest act that forms the Plaintiff's civil rights claim is when the Board of Education accepted the Plaintiff's resignation on December 13, 2011. Thus, under NYEL § 3813, she was required to file her complaint, at the latest, on December 13, 2012. However, she did not file a complaint in this Court until August 2, 2013, over seven months after the statute of limitations period had ended.

The Plaintiff attempts to save her NYSHRL by invoking the continuing violation doctrine. Even assuming that it is appropriate to apply the continuing violation doctrine to a NYSHRL claim, the doctrine requires that at least one of the discriminatory acts that form the basis for the claim occurred within the limitations period. *See Szuszkiewicz*, 12 F.Supp.3d at 338 ("It is essential that at least one act that is 'part of the same actionable hostile work environment practice ... falls within the statutory time period.'") (quoting *Morgan*, 536 U.S. at 120, 122 S.Ct. 2061).

As noted above, the Plaintiff does not allege, nor could she, that any discriminatory act occurred after she left the District on December 13, 2011 for a job as a disability coach at DDI. Since that act occurred outside of the limitations period, she cannot rely on the continuing violation doctrine. Accordingly, the Court finds that the Plaintiff's NYSHRL claim is clearly time-barred.

With regard to the Plaintiff's SCHRL claim, the Defendants argue, without opposition from the Plaintiff, that the SCHRL does not provide a private right of action. (The Def.'s Mem. of Law at 21–22.) The Plaintiff does not respond to the Defendant's argument, nor does she indicate in the complaint the provision or section of the SCHRL that allegedly authorizes her claim. The Court has also been unable to identify any provision of the SCHRL that allegedly gives the Plaintiff a private right of action. Without more, the Court cannot find that the Plaintiff has stated a viable claim under the SCHRL, and therefore also dismisses that claim. *Broomer v. Huntington Union Free Sch. Dist.*, No. 12 CV 574(DRH)(AKT), 2013 WL 4094924, at *7 (E.D.N.Y. Aug. 13, 2013) aff'd, 566 Fed. Appx. 91 (2d Cir.2014) ("[The] [d]efendants argue, without opposition from [the] plaintiffs, that the Suffolk County Human Rights Law does not provide a private right of action.... Because [the] plaintiffs have not opposed dismissal and have failed to indicate the section of the Suffolk County Human Rights Law which provides for such a claim, it is hereby dismissed.").

### III. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment is granted and the Plaintiff's complaint is dismissed in its entirety. The Clerk of the Court is directed to close this case.

**SO ORDERED.**